UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| BRENDA L. BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:19 CV 42 ACL |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

Plaintiff Brenda L. Brown brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her application for Disabled Widow's Benefits under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Brown's severe impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

## I. Procedural History

Brown filed her applications for benefits under Title II and Title XVI on August 16, 2017

and August 15, 2016, respectively. (Tr. 218-19, 205-10.) She claimed she became unable to work on May 1, 2015, due to worsening attention deficit disorder ("ADD"), obsessive compulsive disorder ("OCD"), worsening anxiety, worsening depression, fatigue, and worsening bipolar disorder. (Tr. 246.) Brown was 47 years of age at her alleged onset of disability date. (Tr. 24.) Her applications were denied initially. (Tr. 116-22, 146-51.) Brown's claims were denied by an ALJ on August 29, 2018. (Tr. 15-26.) On April 30, 2019, the Appeals Council denied Brown's claim for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Brown raises the following claims: (1) "the ALJ erred in failing to give proper weight to treating psychiatrist, Dr. Spalding's opinion;" and (2) "the ALJ erred in assessing the RFC." (Doc. 14 at pp. 6, 11.)

## II. The ALJ's Determination

The ALJ first found that Brown is the unmarried widow of the deceased insured worker and has attained the age of 50. (Tr. 17.) She stated that the prescribed period ends on June 30, 2023. *Id.* The ALJ next found that Brown has not engaged in substantial gainful activity since her alleged onset date of May 1, 2015. *Id.* In addition, the ALJ concluded that Brown had the following severe impairments: ADD, bipolar disorder, and generalized anxiety disorder. (Tr. 18.) The ALJ found that Brown did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. *Id.*

As to Brown's RFC, the ALJ stated:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can never climb ladders

> ropes or scaffolds or be exposed to unprotected heights or hazardous work environments; she is able to remember and carry out simple, routine tasks and make simple work-related decisions; the claimant cannot perform production pace tasks that require strict hourly goals; she can have frequent contact with supervisors and occasional contact with coworkers and the general public; the claimant must avoid large crowds of people; and she will be off task for five percent of an eight-hour workday.

(Tr. 20.)

The ALJ found that Brown was unable to perform any past relevant work, but was capable of performing other jobs existing in significant numbers in the national economy, such as dishwasher, linen room attendant, and laundry worker. (Tr. 24-25.) The ALJ therefore concluded that Brown was not under a disability, as defined in the Social Security Act, from May 1, 2015, through the date of the decision. (Tr. 26.)

The ALJ's final decision reads as follows:

> Based on the application for disabled widow's benefits filed on August 16, 2017, the claimant is not disabled under sections 202(e) and 223(d) of the Social Security Act.
>
> Based on the application for supplemental security income protectively filed on August 15, 2016, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

*Id.*

## III. Applicable Law

### III.A. Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate

to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the

record as a whole. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

**III.B. Determination of Disability**

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the

claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a

medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).   The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."   20 C.F.R. § 416.945(a)(3).   The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.   *See id*.   If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled.   *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience.   *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000).   The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy.   *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v).   If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.   If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled.   20 C.F.R. § 416.920(a)(4)(v).   At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability

remains on the claimant.  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."  20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).  The Commissioner must then rate the degree of functional loss resulting from the impairments.  *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  *See id.*  Next, the Commissioner must determine the severity of the impairment based on those ratings.  *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  *See id.*  If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment.  *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV.  Discussion

Brown claims error in the ALJ's weighing of the medical opinion evidence and determining of Brown's RFC.  The undersigned will address these claims in turn.

**1. Opinion Evidence**

Brown first argues that the ALJ erred in failing to give proper weight to the opinions of treating psychiatrist Joseph Spalding, D.O.

Dr. Spalding completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on February 22, 2017. (Tr. 452-54.) Dr. Spalding expressed the opinion that Brown had marked limitations in her abilities to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, interact appropriately with supervisors and co-workers, and respond appropriately to usual work situations and changes in a routine work setting; and moderate limitations in her abilities to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related instructions. (Tr. 452.) He further found that Brown would be absent from work more than four days per month, would be off tasks due to her symptoms 25 percent or more of the workday, and would need to take unscheduled breaks often during the workday. (Tr. 453.)

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart*, 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)). The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000). The record, though, should be "evaluated as a whole." *Id.* at 1013 (quoting *Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir. 1997)). The ALJ is not required to rely on one doctor's opinion entirely or choose between the opinions. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).

Additionally, when a physician's records provide no elaboration and are "conclusory checkbox" forms, the opinion can be of little evidentiary value. *See Anderson v. Astrue,* 696 F.3d 790, 794 (8th Cir. 2012). Regardless of the decision the ALJ must still provide "good reasons" for the weight assigned the treating physician's opinion. 20 C.F.R § 404.1527(d)(2).

The ALJ must weigh each opinion by considering the following factors: the examining and treatment relationship between the claimant and the medical source, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the physician provides support for his findings, whether other evidence in the record is consistent with the physician's findings, and the physician's area of specialty. 20 C.F.R. §§ 404.1527(c)(1)-(5), 416 .927(c)(1)-(5).

The ALJ indicated that she was not assigning controlling weight to Dr. Spalding's opinions because they were not supported by the record. (Tr. 23.) The ALJ offered the following additional explanation for this finding:

> For example, Dr. Spalding opines that the claimant's ability to interact with the public, supervisors and co-workers is markedly impaired. However, there is no support for this in the record. While the claimant states that she gets anxious in crowds, she still shops in stores regularly, attends church and GED classes. The record contains no incidents involving the claimant failing to respond appropriately in these circumstances. Further, she submitted that she has had no difficulties with authority figures and has never lost a position due to inability to get along with others. Dr. Spalding also opines that the claimant would need to take unscheduled breaks during the workday due to crying spells and panic attacks. Again, the record does not support this assertion. While the claimant did have panic attacks that required intervention in 2016, the record does not reflect further attacks since that time. Further, the record is also devoid of any mention of persistent crying spells. Dr. Spalding does not provide any specific reasoning for his opinions, only referring to her diagnoses and general symptomology. It is also noteworthy that Dr. Spalding's opinion is inconsistent with treatment notes that contain multiple references to the claimant 'doing well', feels well', 'overall doing very well', and 'overall, mood is great'. Based on this lack of consistency with the majority of the claimant's treatment records and the lack of supportability in the longitudinal medical history, I have given Dr. Spalding's opinion only partial weight.

(Tr. 23-24; citations omitted.)

Brown contends that the ALJ has "cherry-picked the record" for alleged inconsistencies, when the record demonstrates that her mood vacillates between good and bad days.  (Doc. 14 at p. 7.)

The undersigned finds that the ALJ offered good reasons for assigning less than controlling weight to Dr. Spalding's opinions.  Brown accurately notes that Dr. Spalding has been her treating psychiatrist since October 3, 2016.  Dr. Spalding had seen Brown on three occasions when he provided his February 2017 opinions.  At her initial visit on October 3, 2016, Brown presented to "restart services," and reported she had difficulty controlling her emotions.  (Tr. 584.)  Brown's husband had died two months prior, while living in a nursing home.  *Id.*  She had been to the emergency room for anxiety recently, and reported a depressed mood.  *Id.*  Brown had been diagnosed with ADD twenty years prior and was diagnosed with bipolar disorder two years prior.  (Tr. 585.)  Upon examination, Brown was cooperative, her mood was depressed, she had a full affect, her speech was clear, her thought process was logical, her perception was normal, her thought content and cognition were normal, her intelligence was average, and her insight and judgment were normal.  (Tr. 586.)  Dr. Spalding diagnosed Brown with moderate major depression and ADD.  *Id.*  He prescribed psychotropic medications.  *Id.*  In November 2016, Brown's mood on exam was euthymic.  (Tr. 589.)  Dr. Spalding noted that Brown was "doing well," and continued her medications.  (Tr. 590.)  On February 13, 2017, Brown reported she was "doing well."  (Tr. 592.)  She was reapplying for disability and "also studying for her GED."  *Id.*  On examination, Brown was cooperative, her mood was euthymic, her affect was constricted, her speech was clear, her thought process was logical, perception and

thought content were normal, and her insight and judgment were normal.  (Tr. 593.)  Dr. Spalding found that Brown "continues to do well," and continued her medications.  (Tr. 594.)

Dr. Spalding provided his opinions nine days after Brown's February 2017 visit.  Dr. Spalding's treatment notes do not support the presence of marked limitation in understanding instructions or interacting socially, nor do they support a need for multiple unscheduled breaks or frequent work absences.  The ALJ, therefore, did not err in finding Dr. Spalding's opinions were not supported by his own treatment notes.

Brown points out that Dr. Spalding had access to the records of Brown's previous treating psychiatrist, Dr. Jan Onik, and suggests that Dr. Spalding based his opinions on Dr. Onik's treatment notes as well.  The record contains treatment notes from Dr. Onik for the period of August 2015 through May 2017.  In August 2015, Dr. Onik noted that Brown felt she has "done very well," she looked good, and she felt her affect was improved.  (Tr. 443.)  Brown denied any problems and had no medication side effects.  *Id.*  On examination, Brown was alert, cooperative, her thought content was normal, she was able to perform basic computations and apply abstract reasoning, her mood was "happy" her affect was full and appropriate, and her insight was appropriate.  (Tr. 448.)  Dr. Onik diagnosed Brown with ADD and continued her medications.  (Tr. 445.)  In September 2015, Brown reported she was doing well.  (Tr. 440.)  She was preparing for the GED, and felt she could not focus without her medication.  *Id.*  On examination, Brown was alert and oriented, her attention span and ability to concentrate were normal, she was able to articulate well with normal speech and language, her thought content was normal, she was able to perform basic computations and apply abstract reasoning, and her associations were intact.  (Tr. 441-42.)  Dr. Onik restarted medication for Brown's ADD.  (Tr. 442.)  On October 19, 2015, Dr. Onik noted Brown had done "very well" on her medication.

(Tr. 437.) On examination, Brown's affect was appropriate and stable, her thought content was normal, her attention was impaired, her mood was "labile" and her associations were intact. (Tr. 438.) In December 2015, Brown was "doing very well," and was pleasant and interactive. (Tr. 434.) She complained of fatigue. *Id.* In January 2016, Brown reported she had been doing "very well," was caring for her husband, was involved with her church, and was sleeping well. (Tr. 431.) On April 19, 2016, Brown reported that she had been dealing with the stressors of her husband's renal failure and stroke, which caused him to be placed in a nursing home. (Tr. 429.) On examination, Brown was stable, her mood was happy, her insight was appropriate, and her attention span and ability to concentrate were normal. (Tr. 430.) Dr. Onik diagnosed her with bipolar depression and situational mixed anxiety and depressive disorder. *Id.*

In June 2016, Brown was dealing with the death of her husband as well as could be expected. (Tr. 427.) She was living in a shelter, "as she has no disability, and was unable to stay in her house." *Id.* A representative attended the appointment with Brown, and was helping her obtain disability benefits. *Id.* Brown indicated that she had stopped taking her medications because she was experiencing edema. *Id.* On examination, she was anxious and sad but stable, her insight was appropriate, she was well dressed and groomed, and she exhibited attention deficit. (Tr. 428.) Dr. Onik started Brown on psychotropic medication. *Id.* He stated that Brown was "handling her depression well, and is verbal, the shelter has group meetings, and I feel this interaction helps her." *Id.* In July 2016, Brown was concerned that her medication was not strong enough, but Dr. Onik found that Brown had done "very well," was stable, and should "stay the course." (Tr. 425.) Dr. Onik stated that Brown was well-groomed and appropriate and alert, but was "a little apprehensive about living solo since the death of her husband." *Id.*

In August 2016, Brown reported an increase in anxiety because she has been interacting with more people, and believed the stress has interfered with her concentration. (Tr. 423.) She requested additional medication. *Id.* Dr. Onik noted that Brown had flushed her medication down the toilet and had been off of it approximately two weeks. *Id.* Dr. Onik prescribed Vyvanse.[1] (Tr. 424.) The following month, Dr. Onik found Brown was "doing very well on her present regimen," was self-sufficient living alone, and was attending and interacting with the community organization group. (Tr. 505.) Dr. Onik noted that Brown was non-compliant with her medication dosing and self-adjusted her dosage and flushed medication down the toilet. *Id.* In October 2016, Brown reported she had been off of her medication for over three weeks, and had "done well." (Tr. 503.) Brown indicated she was afraid she had bipolar disorder, but Dr. Onik stated nothing in her behavior suggested she needed to reinstate her medication. *Id.*

On November 15, 2016, Brown reported she had done very well and had weaned herself from the Vyvanse, but was eating more to deal with her anxiety. (Tr. 501.) She complained that she had gained thirty pounds and wanted to lose weight. *Id.* Dr. Onik advised Brown on the importance of diet. *Id.* On December 13, 2016, Dr. Onik found Brown was "doing very well at home without her medication," and was taking a GED class. (Tr. 499.) Although Brown still has "very slight episodes of anxiety, she is able to handle them well." *Id.* In January 2017, Brown presented with "marked frustration of her weight gain," reporting difficulty maintaining her diet due to hunger. (Tr. 496.) She exhibited slight depression and decreased affect, but was alert and oriented. *Id.* The following month, Dr. Onik noted Brown presented with "marginal improvement in her weight." (Tr. 490.) Brown felt "well with no complaints." *Id.*

---

[1]Vyvanse is a stimulant medication indicated for the treatment of ADD. *See* WebMD, http://www.webmd.com/drugs (last visited August 4, 2020).

Dr. Onik's records are not supportive of Dr. Spalding's opinions.  As the ALJ pointed out, Dr. Onik's treatment notes are replete with references that Brown was "doing well," despite suffering from multiple mental impairments.  Dr. Onik's records do not support the presence of marked limitations in any area.

Brown points to evidence she alleges the ALJ ignored, such as the fact she sought emergency room treatment for panic attacks in March 2016, was depressed in February 2016 and June 2016, had increased anxiety in June 2016 and August 2016, and had attention deficits in August 2016.  The ALJ, however, did not ignore this evidence.  Instead, the ALJ acknowledged that, although Brown "did have panic attacks that required intervention in 2016, the record does not reflect further attacks since that time."  (Tr. 24.)  Earlier in her opinion, the ALJ stated that, in 2016, Brown "experienced multiple setbacks due largely to situational events."  (Tr. 21.)  She stated that Brown went to the emergency room on multiple occasions in 2016 for symptoms of depression and anxiety, but providers noted that these events "corresponded to times when her husband's health was deteriorating and when he passed away."  (Tr. 21, 642, 654, 665.)  She noted that, by the end of June 2016, Brown's medications had been adjusted and her outlook was improving, with her doctor noting she was handling her depression well.  (Tr. 21.)  Brown was regularly found to be cooperative, oriented, with appropriate insight, logical thought process, and good eye contact, and generally doing well on her medication regimen.  *Id.*

In sum, the ALJ provided sufficient reasons for assigning only partial weight to Dr. Spalding's opinions.  Dr. Spalding's opinions lack support in his own treatment notes and the record as a whole.  Although Dr. Spalding found Brown's ability to interact with others was markedly impaired, there is no documentation of these difficulties as she shops in stores regularly, attends church, and attends GED classes.  (Tr. 23-24, 332-37.)  The record also lacks

support for Dr. Spalding's finding that Brown requires unscheduled breaks during the workday due to crying spells and panic attacks. The only evidence of panic attacks occurred in 2016, when Brown was experiencing significant stress in her life related to her husband's death. The record does not document persistent crying spells. Dr. Spalding's opinions that Brown suffers from multiple marked limitations is inconsistent with the medical evidence that documents Brown was doing well with treatment. Thus, the ALJ did not err in evaluating Dr. Spalding's opinions.

  **2. RFC**

Brown next argues that the ALJ's RFC determination is not supported by substantial evidence. Specifically, she contends that, other than Dr. Spalding's opinions, there is no medical evidence in the record from any treating or examining expert about Brown's ability to function in the workplace. Brown contends that the ALJ was therefore required to develop the record. She argues that the ALJ's failure to obtain additional medical evidence renders the RFC without the support of substantial evidence.

It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of her limitations. *Pearsall*, 274 F.3d at 1217. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). There is no

requirement, however, that an RFC finding be supported by a specific medical opinion. *See Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012); *see also Martise*, 641 F.3d at 927 (An ALJ "is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians."). Furthermore, "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Cox*, 495 F.3d at 619-20.

The ALJ concluded that Brown had the following limitations due to her mental impairments: is able to remember and carry out simple, routine tasks and make simple work-related decisions; cannot perform production pace tasks that require strict hourly goals; can have frequent contact with supervisors and occasional contact with coworkers and the general public; must avoid large crowds of people; and she will be off task for five percent of an eight-hour workday. (Tr. 20.)

The ALJ explained that this RFC was based on the objective findings and treatment as well as inconsistencies between Brown's allegations and her daily activities. For example, the ALJ noted Brown regularly provides care for her granddaughter and her cats, has no problems attending to her personal care, prepares her own meals, performs household chores, goes out regularly, walks and takes public transportation, regularly shops in stores, handles her own financial matters, regularly attends church, and attends GED classes. (Tr. 22-23, 332-37.) The ALJ stated that the mental abilities and social interactions required to perform some of these activities are the same as those necessary for obtaining and maintaining employment. (Tr. 23.)

The ALJ also discussed the opinion evidence of the state agency consultant. *Id.* Mark Altomari, Ph.D, completed a Mental Residual Functional Capacity Assessment on June 27, 2017. (Tr. 528-29.) He expressed the opinion that Brown was moderately limited in the following

abilities:   understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, work in coordination with and proximity to others without being distracted by them, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others.   *Id.*  Dr. Altomari found that Brown retained the ability to understand and remember simple instructions, carry out simple work instructions, maintain adequate attendance and sustain an ordinary routine without special supervision, interact adequately with peers and supervisors but would do best in a setting with limited social contact, and can adapt to most usual changes common to a competitive work setting.   (Tr. 530.)

The ALJ noted that Dr. Altomari's opinions are supported by a detailed narrative that explains that evidence upon which he relied.   (Tr. 23.)   Dr. Altomari provided a thorough summary of the medical evidence.   (Tr. 527.)   In addition to the treatment notes already discussed, Dr. Altomari cited notes from Comprehensive Health Systems dated September 12, 2016.   (Tr. 527.)   These records indicate Brown's husband had passed away three months prior, which left her with no source of income.   (Tr. 465.)   Brown reported that she had applied a second time for disability benefits, and was "not seeking employment out of concern that it would cause her to be denied for disability if she were working."   *Id.*   She complained of symptoms of depression, anxiety, and difficulty focusing, but "feels her symptoms are fairly well managed."   *Id.*   Brown was attending a group on a daily basis and felt groups had helped her significantly in providing information and in helping her be more social with other people.   *Id.*

This evidence supports the ALJ's finding that Brown retained the ability to perform work activity despite her mental impairments.

The ALJ concluded that the treatment notes in the record do not support Brown's allegations of disabling mental limitations. (Tr. 24.) She continued that Brown's allegations were further weakened by evidence of her daily activities. *Id.* As a result, the ALJ found that Brown has "severe impairments resulting in significant work-related limitations, but only to the extent described in the residual functional capacity determination." *Id.*

The ALJ's RFC determination is supported by substantial evidence in the record as a whole. In her discretion, the ALJ made an RFC finding that did not precisely reflect any of the medical opinions of record. *See Martise*, 641 F.3d at 927 (ALJ is not required to rely entirely on one particular physician's opinion or choose between opinions). The ALJ did not err in assigning weight to Dr. Altomari's opinions. *See Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016) (proper for ALJ to rely on state agency physicians' opinions, in part, in formulating RFC). The ALJ did not rely solely on Dr. Altomari's opinion but, instead, considered the treatment notes of Drs. Spalding and Onik, as well as Brown's testimony and statements regarding her daily activities.

Brown also suggests that the ALJ failed to properly develop the record in that she did not obtain additional medical evidence regarding Brown's mental limitations. An ALJ has a duty to fully and fairly develop the record, and failure to do so is reversible error when the record "does not contain enough evidence to determine the impact of a claimant's impairment on h[er] ability to work." *Byes v. Astrue*, 687 F.3d 913, 915-16 (8th Cir. 2012). "However, the burden of persuasion to prove disability and to demonstrate RFC remains on the claimant." *Eichelberger v. Barnhart*, 390 F.3d 584, 592 (8th Cir. 2004). "An ALJ's duty to develop the record arises

only if a crucial issue was undeveloped." *Leininger v. Colvin*, No. 4:12-CV-623 JCH/TIA, 2013 WL 5276039, at *14 (E.D. Mo. Sept. 18, 2013).

Here, the record as a whole contained sufficient evidence for the ALJ to make her determination. In making this determination, the ALJ summarized the medical evidence of record and found it was inconsistent with Brown's allegations of disability. Treatment notes reveal Brown experienced deficits in concentration, and symptoms of depression and anxiety, but was doing well on her medication regimen. The ALJ nonetheless credited Brown's allegations in imposing significant limitations related to her documented difficulties with attention and interacting with others. Brown has failed to demonstrate the presence of greater limitations than those found by the ALJ.

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/**s**/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 21st day of September, 2020.